

**MURIEL GOODE-TRUFANT**
*Acting Corporation Counsel*

THE CITY OF NEW YORK
# LAW DEPARTMENT
100 CHURCH STREET
NEW YORK, NY 10007

**JOSEPH A. RUSSO**
*Assistant Corporation Counsel*
Phone: (212) 356-2376
Fax: (212) 356-3509
jorusso@law.nyc.gov

June 10, 2024

**BY ECF**
Honorable Eric R. Komitee
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

     Re:  Akram Farghaly, et al. v. Marlon Mitchell, et al.
        16-CV-6660 (EK) (JAM)

Your Honor:

  I am an Assistant Corporation Counsel in the Office of Muriel Goode-Trufant, Acting Corporation Counsel of the City of New York, and one of the attorneys assigned to represent the City of New York and Marlon Mitchell ("Defendants") in the above-referenced matter. Defendants write in accordance with the Court's Order on May 20, 2024, instructing the parties to "indicat[e] which statements or representations made during the course of this litigation they now believe were inaccurate or lacked evidentiary support," and to include "a chronology of relevant document requests and responses."

**Relevant Procedural Background**

  As the Court is aware, during the final pretrial conference on April 30, 2024, Defendants sought clarification of the Court's ruling *in limine* regarding the testimony that would be permitted from one of Plaintiffs' expert witnesses, Dr. Yuri Koyen, about causation of Plaintiff Farghaly's alleged lower back injury, and the possibility that Farghaly had suffered such injury *before* his interaction with Traffic Agent Mitchell on November 2, 2015 (which Plaintiffs' counsel unequivocally represented did not exist). In the weeks that followed, the parties filed letters regarding Plaintiffs' failures to comply with Rule 26 of the Federal Rules of Civil Procedure with respect to Dr. Koyen's expert report and their failure to produce Farghaly's medical records that pre-dated the arrest at issue. *See* ECF Nos. 100, 104-110. Another conference was held regarding this issue on Friday, May 17, 2024, at which Plaintiffs were ordered to produce *all* of Farghaly's

medical records from Dr. Hossam Amin from 2010-present.  Approximately 50 minutes after the May 17 conference, Plaintiffs produced these additional Dr. Amin records.  Plaintiffs voluntarily withdrew the case the following day, on May 18, 2024.  We now write pursuant to the Court's May 20 Order.

A. **Chronology of Relevant Document Requests and Responses**

Plaintiffs commenced this action on December 1, 2016.  On December 30, 2016, this Office mailed Plaintiffs' counsel a letter requesting signed Criminal Procedure Law § 160.50 releases and HIPAA authorizations.  Plaintiffs sent signed releases via email, two and a half months later, on March 15, 2017.  *See* 12/30/16 Letter and authorizations received in response, annexed as Exhibit A.  The HIPAA releases only authorized records from the date of incident (November 2, 2015) to present.  As part of Defendants' Initial Disclosures, Defendants produced both Plaintiffs medical records that this Office received in response to the aforementioned HIPAA releases on April 18, 2017, and May 8, 2017, respectively.

On July 18, 2017, Defendants served Plaintiffs with their first set of interrogatories and requests for production of documents.  Defendants document requests sought, *inter alia*, records from all of Plaintiffs' healthcare providers since the date of the incident *and for the five years prior to the incident*, as well as HIPAA authorizations for same.  *See* Document Request Nos. 3 and 11, dated July 18, 2017, attached as Exhibit C to Defendants' 5/6/24 Letter, ECF No. 104.  Three months later, on October 12, 2017, Plaintiffs served their objections and responses to Defendants' discovery demands.  In response to Document Request Nos. 3 and 11, Plaintiffs objected to the extent that the requests were "duplicative insofar as the medical records it [sought] have previously been already provided to Defendants by Plaintiffs . . . and which records, by reasonable deduction, all remain in the possession of Defendants."  *See id.*  Plaintiffs then (1) reproduced their post-incident medical records that Defendants had already produced, and (2) re-sent HIPAA authorizations for medical records, again limited the date of the incident until present, thereby leaving the impression that these records were the only ones responsive to Defendants' requests.[1] *Id.*

B. **Evidence for Cross Examination and Other Misrepresentations**

1. Throughout the course of litigation, both Plaintiffs Farghaly and Mohamed made numerous misrepresentations and misstatements in their General Municipal Law Section 50-h hearings, in their depositions, and in an affidavit. The extent of Farghaly's back injuries, Mohamed's injuries, as well as the loss of consortium claim, medical records, tax returns, Taxi and Limousine Commission records, and video capturing the incident all support this belief.  Some of Plaintiffs' misrepresentations are evidenced by documents that were already in Defendants' possession before trial, and Defendants intended to highlight Plaintiffs' false statements via cross examination during a trial. Others more material misstatements were discovered from additional records obtained

---

[1] Plaintiffs continued receiving medical treatment after October 12, 2017, but never supplemented their discovery responses with updated medical records as is required under Rule 26(e), until the Court ordered them to do so on May 17, 2024.

on the eve of trial. We bring the full scope of them to the Court's attention here pursuant to the May 20 Order. **Farghaly's Lower Back Pain & Injury**

One of Plaintiff Farghaly's damages that was to proceed to trial concern lower back injuries he allegedly sustained during his altercation with Defendant Mitchell. Farghaly repeatedly testified that he did not have pain or injury to his lower back before the 2015 incident underlying this lawsuit. Specifically, Farghaly testified at his GML 50-h hearing:

> Q: "Have you ever injured your lower back before this incident?"
> A: "No."
> Q: "Have you ever had any problems with pain in your lower back before this incident?"
> A: "No."

Farghaly's GML § 50-h Hearing Testimony taken on May 3, 2016 ("Farghaly 50-h"), annexed hereto as Exhibit B, 54:4-10. Additionally, Plaintiff was asked at his deposition two and one-half years later:

> Q: "When did you first develop the lower back pain?"
> A: "Right after it happened."
>
> Q: "Did you ever have back pain before November 4, 2015?"
> A: "I never complained that much. I mean I was doing a little bit of exercise. No. If you need a straight answer, no."

Farghaly deposition taken on October 5, 2018 ("Farghaly Dep."), annexed hereto as Exhibit C, 42:19-20; 43:2-6.

The medical records produced on May 17, 2024, three days before trial, and at the Court's insistence, indicated that Plaintiff had been suffering from chronic lower back pain for years. *See* Excerpts of Medical Records for Farghaly from Dr. Amin ("Amin Records"), annexed hereto as Exhibit D, at DR. AMIN 574-574, 600-601, 612-614.[2] Significantly, Farghaly received an MRI of his lumbar spine on March 19, *2010*. *See id.* at DR. AMIN 600. This MRI revealed that, long before the incident at issue in this case, Plaintiff had "a central disc herniation with central annular tear." *Id*. These facts completely contradict Plaintiff's repeated claims, made under oath, that he did not suffer from lower back pain or injury prior to November 2, 2015. This is compounded by the fact that Plaintiff's medical records, which he possessed prior to his deposition, revealed that there were "prior studies" done on his lumbar spine in 2010. *See* MRI 4/23/2016, D000097, attached hereto as Exhibit E.

---

[2] Plaintiff produced the newly obtained Dr. Amin records on May 17, 2024 without any Bates Stamp numbering. Rather than attach the entire 617-page PDF to this letter, for ease of reference, Defendants added Bates stamp numbering and attach only the relevant pages hereto as Exhibit D.

2. **Loss of Consortium**

Plaintiff Mohamed's only claim for trial was that of Loss of Consortium. Farghaly and Mohamed were claiming as part of their damages for trial that they suffered, *inter alia*, injury to their sex life after November 2, 2015. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████
This also suggests that Plaintiffs likely lied about their pre-incident sex life to inflate their damages in this litigation.

3. **Mohamed's Physical Injuries**

Plaintiff Mohamed testified at her deposition that her husband's arrest and post-arrest demeanor at home caused her to suffer physical injuries, such as ███████████ ███████, which she claimed she had never experienced before. *See* Mohamad deposition taken on October 12, 2018 ("Mohamed Dep."), annexed hereto as Exhibit F, 65:4-19. To the contrary, Mohamed's physical therapy record indicates that, two weeks after her husband's arrest, she had reported "*increased* ███████████████████████████████████████ *secondary to* ███████████," and it also indicates that she reported the "Injury/Onset" Date as August 16, 2015 (three months before her husband's arrest). *See* Mohamed Medical Records, annexed hereto as Exhibit G, at D000127. Additionally, her Bay Ridge Medical Imaging records from September 15, 2015 indicate that she had gotten an X-ray of her ███████████████████ *See id.* at D00103. This suggests that Mohamed also misrepresented the cause of her purported ███████████████████ as another way to inflate her damages.[3]

4. **Tax Returns and Employment**

In May 2016, Plaintiff Farghaly claims that his taxes were filed for 2013 and 2014. *See* Farghaly 50-h Ex. B, 15:13-25. On October 12, 2017, Plaintiffs responded to Defendants' discovery requests with copies of their tax returns from 2013 through 2016. Upon review, it appears that the tax returns for each of those years were filed on *October 9, 2017*. *See* Excerpts from Plaintiffs' 2013-2016 tax returns, produced to Defendants on October 17, 2017, annexed

---

[3] Plaintiffs never produced Mohamed's medical records for the five years pre-dating the incident, even though those were also requested as part of Defendants' Document Request Nos. 3 and 11. *See* Exhibit C to Defendants' May 6 Letter, ECF No. 104.

hereto as Exhibit H. Thus, it appears that Plaintiffs' tax returns were filed only after Defendants' discovery requests in this litigation.

Additionally, Farghaly's gross income from driving a taxi was $▮ in 2015, and $▮ in 2016. Farghaly reported expenses associated with driving as follows: $▮ in 2015, and $▮ in 2016. *See id.* Farghaly testified that after November 2, 2015, he was suspended from driving a cab for three months and a week. Farghaly Dep., Ex. C, 33:3-4. He testified that, prior to this incident, he was working six days a week for up to 12 hours a day. *Id* at 31:7-11. However, his tax returns suggest that he was not driving a taxi nearly that frequently in 2015. *See* Ex. H. Further, Plaintiff claims that after the incident when he was able to, he was working only two to three days a week for seven or eight hours a day. Farghaly Dep., Ex. C, 34:1-9. Although both Plaintiffs claim that they both suffered economic loss from Farghaly's work suspension and alleged back injury, and that Farghaly allegedly worked *fewer hours* after the incident, it nonetheless appears that Farghaly made more than double the income *from driving a taxi* in 2016—the year *after* the incident.

Further, Plaintiff Mohamed seemingly misrepresented her employment history. Specifically, Mohamed testified at both her 2016 GML § 50-h examination and 2018 deposition that she was unemployed at the time of the incident at issue in this case and only gained employment in early 2016. *See* Mohamed GML 50-h, annexed as Exhibit I, 13:10-14:11; Mohamed Dep., Ex. F, 78:22-79:15. However, in their response to Defendants' Interrogatory No. 6, Plaintiffs stated that Mohamed was employed from 2013 through 2016. *See* Plaintiffs' Response to Defendants' Interrogatory No. 6, annexed hereto as Exhibit J. Although it is unclear from the current record which of these statements are correct, it is evident that Plaintiffs misrepresented Mohamed's employment history in this litigation.

5. **Events of the November 2, 2015 Incident**

Plaintiff Farghaly had multiple sworn accounts of the incident that that occurred on November 2, 2015. At his deposition he testified:

> Q: "After that second time when he asked you to get out of his way and you did not get out of his way, what happened then?"
> A: "I get hit by the fire hydrant and drop on the floor; and then by the time I get up, that 30 seconds, he disappear. He's gone."

Farghaly Dep., Ex. C, 126:7-13. Plaintiff did not mention making contact with a fire hydrant and then the ground at any point during his GML 50-h testimony. In the video capturing this portion of the incident, it is clear that Plaintiff Farghaly never makes contact with a fire hydrant or falls to the ground as a result. *See* Defense Trial Exhibit A. Further, the video depicts Plaintiff being separated from Agent Mitchell while both men are standing up on their feet and Agent Mitchell did not walk away. *Id*. As such, Plaintiff's claim that he made contact with a fire hydrant and then the ground for "30 seconds" allowing Agent Mitchell to "disappear" are false. It should be noted that the video of the incident was produced by Defendants to Plaintiffs on April 10, 2017, almost one and a half years before his deposition. Additionally, on October 12, 2017, also a year before Farghaly's deposition, Plaintiffs produced a video capturing the incident from another angle. That

video clearly depicts that Plaintiff never made contact with a fire hydrant or fall to the ground.[4] *See* Video annexed hereto as Exhibit K, at elapsed time 0:28-0:35.

Plaintiff attempted to correct the first part of this misstatement in his affidavit opposing summary judgment signed on September 12, 2019. In the affidavit he attests:

> "As I try and dissuade Agent Mitchell from leaving the scene he pushed me hard one final time causing me to fall backwards and strike my back hard against a parked car near a fire-hydrant, which is what I confusedly thought I struck, but upon review of the video saw that it was the car near the fire-hydrant that I struck and not the fire-hydrant."

Farghaly Affidavit, attached as an Exhibit to Decl. of Rehan Nazrali in Opposition to Defendants' Motion for Summary Judgment at ECF No. 47 ¶ 18. However, he fails to correct the fact that he was not on the ground for 30 seconds (or any amount of time) and Agent Mitchell did not immediately disappear from the location.

These misstatements are especially troubling considering that Plaintiff reported to Dr. Koyen on December 27, 2018, that he was "pushed on the hydrant." Dr. Koyen then relied on that information to make a determination that Agent Mitchell caused Plaintiff's lower back injuries. *See* Dr. Koyen Report at 1, attached as Exhibit B to Defendants' 5/6/24 letter, ECF No. 104.

## C. **Efforts to Obtain All Medical Records**

Plaintiff's counsel has made several representations throughout this litigation, and during the last three court conferences, that Plaintiff Farghaly had no prior back injury pre-dating the incident at issue in this case, and specifically that Farghaly did not see Dr. Amin about any prior back injury before his November 2015 arrest. *See* 4/30/24 Tr. 10:9-13; 5/17/24 Tr. 10:11-13. However, it appears that Plaintiffs' counsel had sent Dr. Amin's office a letter request for Plaintiff Farghaly's *entire* medical record (without time limitation) dated June 28, ***2016***, as well as a HIPAA release signed by Farghaly, authorizing his counsel to obtain his *entire* medical records. *See* Amin Records, Ex. D, at DR. AMIN 343. This suggests, at the very least, that Dr. Amin's office received a letter from Plaintiffs' counsel requesting the records, that includes Farghaly's long history of lower back pain. But they do not conclusively demonstrate that Plaintiffs' counsel was in possession of Farghaly's pre-incident medical records since 2016—there is still the possibility that Dr. Amin's office either ignored that request in 2016 or they did not send counsel the *entire* records that were requested despite handwriting the word "Sent" on counsel's 2016 request letter. *See id.* Nevertheless, these pages may belie counsel's claim at the conferences that his office "did not

---

[4] The parties represented at the April 30 conference that Defendants' Trial Exhibit A was the *only* video of the incident. 4/30/24 Tr. 27:21-23. Defendants subsequently discovered another video on a CD that Plaintiffs had produced on October 12, 2017 (which is part of Defendants' Trial Exhibit O), depicting the same events but recorded by a different person from a different angle. Only after reviewing the transcript from the April 30 conference did Defendants realize that the parties mistakenly represented that there was only one video of the incident, so Defendants correct that representation herein.

obtain any past records for [Plaintiff Farghaly's] back" and that Plaintiff Farghaly "never complained of anything from his back with Dr. Amin." 5/17/24 Tr. 10:11-13; *see also* 4/30/24 Tr. 10:9-13 ("[T]here have been no complaints of the same injury beforehand. He has no history of treating the same part of the body, so there wasn't a need for a prior MRI."). Further, the fact that Plaintiffs' counsel was able to send 617 pages of Dr. Amin records less than one hour after the May 17th conference shows that, even if Plaintiffs' counsel was not already in possession of all of the pre-2015 records, they could have obtained same with relative ease in response to Defendants' discovery requests or in response to Defendants raising these discovery issues as early as the April 30 conference.

**D.     Plaintiff Farghaly's TLC License Suspension History**

During the May 20 conference, Plaintiffs' counsel represented to the Court that Plaintiffs decided to withdraw their claims on the eve of trial due to "a record from the TLC," which he described as "the shot from the grassy knoll." *See* 5/20/24 Tr. 3:19-5:5. Defendants now must correct the record regarding this document.

Throughout this litigation, Plaintiff Farghaly has alleged that the Taxi and Limousine Commission ("TLC") suspended him from driving his taxi for "three months and a week" after November 2, 2015, which he alleged caused him to suffer severe economic damages. *See* Farghaly Dep., Ex. C, 33:1-9.

As part of trial preparation, Defendants obtained Farghaly's TLC License Suspension History. On May 17, 2024, the same day it was received, it was immediately produced to Plaintiffs pursuant to Rule 26(e). To clarify, this document was not responsive to any of Plaintiffs' discovery requests, and Defendants would not have been not obligated to produce it pursuant to Rule 26(a)(1)(A) because it would have been strictly impeachment evidence and it was not in Defendants' possession prior to May 17, 2024. However, after discovering the extent of Plaintiffs' inconsistent testimony and allegations while preparing for trial, and suspecting that Plaintiffs may have fabricated more than just their alleged physical damages, Defendants requested any suspensions records from the date Farghaly obtained the license in 2012.

On May 17, 2024, TLC Legal sent the Driver Abstract and TLC License Suspension History to defense counsel, which did not list any suspension of Farghaly's TLC license in 2015 or 2016 as he persistently and falsely alleged in this case.[5] *See* TLC Suspension History, annexed hereto as Exhibit L. It was unclear whether Defendants would have been permitted to use this document at trial if Farghaly falsely testified that his TLC license was suspended as a result of the underlying incident. However, Plaintiffs' counsel did not cite this material falsehood as the reason

---

[5] To clarify, Plaintiff Farghaly's TLC license was suspended three times in six years (none of them in 2015 or 2016) because he failed to *take* a drug test by the required deadline, and those suspensions were lifted once Plaintiff took and passed those drug tests. Had Plaintiffs made a reasobale inquiry after Defendants produced this document on May 17, we could have explained this to them. Contrary to Plaintiffs' counsel's argument during the May 20 conference, the TLC document was only relevant to show that Plaintiff Farghaly has falsely alleged for the last eight years that his TLC license was suspended for over three months as a result of his November 2015 arrest.

for withdrawing this case on the eve of trial; instead, he attributed the withdrawal *solely* to the TLC Suspension History's mention of suspensions for "drug reasons." *See* 5/20/24 Tr. 3:19-5:5.

Although Plaintiffs' counsel represented that the newly obtained Dr. Amin records revealing a previously undisclosed long history of a preexisting back injury "wasn't going to be . . . what would have thwarted [him] going forward" with trial, *see* 5/20/24 Tr. 4:23-5:5, the pre-incident medical records directly undermined the heart of Farghaly's force claims and loss of consortium claim that remained for trial. Notwithstanding, Plaintiffs' counsel's stated reason for Plaintiffs withdrawing this case—that Plaintiff's suspension history mentioned a drug test, which likely would not have even come out at trial—seem even more attenuated. Indeed, this record was not yet "certified" by TLC, and there were far less drastic measures available to Plaintiffs to minimize (or even avoid altogether) the potential impeachment at trial from just this document alone.

### E.     Defendants Intend to Seek Additional Sanctions Against Plaintiffs

In light of Plaintiffs' material misrepresentations that recently came to light, Defendants believe that sanctions against Plaintiffs are appropriate in addition to the sanctions requested in Defendants' May 10 letter (ECF No. 105) to the extent that they are not now moot by Plaintiffs' voluntary withdrawal. But because the Court directed that the purpose of the instant letter "is just clarifying the factual record," *see* 5/20/24 Tr. 8:2-19, Defendants can submit a separate letter upon the Court's direction detailing the sanctions it believes would be appropriate under the Federal rules and this Court's inherent power.[6]

Defendants thank the Court for its time and consideration herein.

Respectfully submitted,

Joseph A. Russo
*Assistant Corporation Counsel*

cc:     Rehan Nazrali, Esq. (via ECF)

Attachments

---

[6] In short, Defendants submit that sanctions imposed against Plaintiffs and counsel based on the conduct set forth in this letter should include, but not limited to: (1) Plaintiffs bearing the full jury cost from the jury selection on May 6, 2024; (2) Plaintiff paying all reasonable costs incurred by Defendants as part of this litigation, including the costs for transcripts of court conferences and depositions; and (3) Plaintiffs paying reasonable attorneys' fees to Defendants.